**ANDERSON & KARRENBERG**
Jared D. Scott (#15066)
50 West Broadway, Suite 600
Salt Lake City, Utah 84101-2035
Telephone: (801) 534-1700
Facsimile: (801) 364-7697
jscott@aklawfirm.com

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| EMILY JEAN BOERS, derivatively on behalf of PACS GROUP, INC., <br><br> Plaintiff, <br><br> v. <br><br> JASON MURRAY, DERICK APT, EVELYN DILSAVER, MARK HANCOCK, TAYLOR LEAVITT, MICHELLE LEWIS, and JACQUELINE MILLARD, <br><br> Defendants, <br><br> and <br><br> PACS GROUP, INC., <br><br> Nominal Defendant. | Case No: <br><br><br> **JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Emily Jean Boers ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant PACS Group, Inc. ("PACS" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Jason Murray ("Murray"), Derick Apt ("Apt"), Evelyn Dilsaver ("Dilsaver"), Mark Hancock ("Hancock"), Taylor Leavitt

- 1 -

("Leavitt"), Michelle Lewis ("Lewis") and Jacqueline Millard ("Millard") (collectively, the "Individual Defendants," and together with PACS, "Defendants") for breaches of their fiduciary duties as directors and/or officers of PACS, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and contribution under Sections 11(f) of the Securities Act of 1933 (the "Securities Act") and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding PACS, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from April 11, 2024 through November 5, 2024, both dates inclusive (the "Relevant Period").

2. PACS represents itself to be "a holding company investing in post-acute healthcare facilities, professionals, and ancillary services."[1] Founded in 2013, PACS is one of the largest post-acute platforms in the United States, with its independent subsidiaries operating 315 post-

---

[1] https://ir.pacs.com/

acute care facilities across 17 states and serving nearly 30,000 patients daily.

3.      Post-acute facilities provide additional assistance to individuals recuperating from acute conditions, illnesses, or medical procedures once they have been discharged from the hospital. A large percentage of the patients who use PACS' facilities are beneficiaries under Medicaid and Medicare, and, as a result, a substantial amount of PACS' revenue is derived from payments from these programs. Under the Medicare program, PACS will receive higher payments from patients who require a greater level of skilled care than those who do not.

4.      Additionally, PACS has historically driven its growth by acquiring underperforming long-term custodial care skilled nursing facilities and turning them into high acuity, high value short-term transitional care skilled nursing facilities.

5.      On April 12, 2024, the Company filed its Form 424B4 (the "IPO Prospectus") with the SEC. In the IPO Prospectus, the Company received approximately $450 million in proceeds by selling 21,428,572 shares of common stock at a price of $21.00 per share. The proceeds were purportedly to be used to repay the Company's outstanding credit and to support the growth of PACS' business.

6.      In the IPO Prospectus and various other press releases and SEC filings made throughout the Relevant Period, the Individual Defendants represented, *inter alia*, that "***Medicare and Medicaid*** represented [PACS'] largest sources of revenue" and that "[s]killed nursing services revenue reflects the portion of patient and resident service revenue generated from all patients in skilled nursing facilities."[2] However, these rosy representations failed to disclose that, in reality, the Individual Defendants were causing the Company to participate in a scheme to submit false

---

[2] All emphasis has been added unless otherwise stated herein.

Medicare claims, which drove more than 100% of the Company's operating and net income from 2020 through 2023.

7.      The truth began to emerge on November 4, 2024 when Hindenburg Research published a report titled "PACS Group: How To Become A Billionaire In The Skilled Nursing Industry By Systematically Scamming Taxpayers" (the "Hindenburg Report"). The Hindenburg Report included interviews with 18 former PACS employees and analyzed more than 900 PACS facility reports. Notably, the Hindenburg Report detailed how PACS had manipulated a COVID-era waiver program and falsely shifted patients to Medicare claims which "***drove more than 100% of PACS' operating and net income from 2020 – 2023***, enabling PACS to IPO in early 2024 with the illusion of legitimate growth and profitability." The Hindenburg Report further alleged that, when the profitability gleaned from engaging in such scheme began to dry up, PACS maintained its inflated revenue streams by "***bill[ing] thousands of unnecessary respiratory and sensory integration therapies to Medicare Part B regardless of clinical need or outcomes***." In addition, the Hindenburg Report reported that PACS began to skirt regulations by engaging in a "***scheme whereby PACS attempted to fool regulators by 'renting' licenses from third parties to 'hang' on buildings***" and then "***either employ[] unlicensed administrators*** or ha[ve] administrators manage multiple buildings in excess of state mandated limits." The Hindenburg Report further detailed how "***PACS secretly lists uncertified nurse aids (NAs) as certified*** in the system, in an apparent scheme to cheat staffing ratios" and "***retroactively add fake RN hours***" in order "to meet minimum staffing requirements, boost star ratings, and avoid costly penalties."

8.      On this news, the price per share of PACS stock fell $11.93, or approximately 27.78%, from a closing price of $42.94 per share on November 1, 2024, to close at $31.01 per

share on November 4, 2024, on unusually heavy trading volume.

9.      The truth fully emerged days later on November 6, 2024 when, before the market opened, it was announced that PACS would postpone its earnings release for the fiscal third quarter of 2024. It was further revealed that the Company had "***received civil investigative demands from the federal government regarding the Company's reimbursement and referral practices that may or may not be related to this week's third-party report.***"

10.      On this news, the price per share of PACS stock fell $11.45, or approximately 38.8%, from a closing price of $29.54 per share on November 5, 2024, to close at $18.09 per share on November 6, 2024, after unusually heavy trading volume.

11.      During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (i) PACS had misused the COVID-era waiver program to artificially inflate its revenues; (ii) the Company's revenue growth was actually driven by fraudulently billing patients for unnecessary and unused medical services; (iii) PACS was misclassifying employees in violation of its licensure requirements; and (iv) as a result of the foregoing, PACS' risk disclosures mischaracterized adverse facts that the Company was actually facing as mere possibilities. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

12.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls while, at the same time, two of the Individual Defendants engaged in improper insider sales while the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, netting combined total proceeds of approximately *$656.8 million*.

13.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to a federal securities class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, losses associated with the civil investigative demands PACS received from the federal government regarding the Company's reimbursement and referral practices, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

14.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

15.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of Defendant Murray's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of

- 6 -

Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 11(f) of the Securities Act (15 U.S.C. § 77k(f)(1)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

17.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

**Plaintiff**

20.     Plaintiff is a current shareholder of PACS. Plaintiff has continuously held PACS common stock at all relevant times.

**Nominal Defendant PACS**

21.     Nominal Defendant PACS is a Delaware corporation with its principal executive offices at 262 N University Ave, Farmington, Utah 84025. PACS' common stock trades on the

New York Stock Exchange ("NYSE") under ticker symbol "PACS."

**Defendant Murray**

22.    Defendant Murray founded PACS in 2013 and has served as the Company's CEO and as Chairman of the Board since its inception. According to the Prospectus filed with the SEC in connection with the Company's secondary public offering, upon the Company's secondary public offering, Defendant Murray beneficially owned 54,626,199 shares of the Company's common stock, representing 35.2% of the Company's voting power. As a result, Defendant Murray was a controlling shareholder of the Company.

23.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Murray made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| April 15, 2024 | 1,607,142 | $21 | $33,749,982 |
| September 9, 2024 | 8,128,352 | $36.25 | $294,652,760 |

Thus, in total, before the fraud was exposed, he sold 9,735,494 shares of Company stock on inside information, for which he received approximately $328.4 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

24.    The Company's website states the following about Defendant Murray:[3]

Jason has more than 20 years of experience working as an executive in acute and post-acute healthcare settings and is a licensed nursing home administrator. He is the chief executive officer and one of two founders/owners of PACS Group Inc., a rapidly growing national platform investing in the continuum of post-acute care, including post-acute care professionals, ancillary services, and 315 post-acute facilities in 17 states across the country.

---

[3] https://ir.pacs.com/corporate-governance/board-of-directors

Jason is a Fellow of the American College of Healthcare Executives (FACHE) and holds a master's degree in healthcare administration. He was named 2023 Mountain West Entrepreneur of the Year by Ernst & Young and was a finalist for their national Entrepreneur of the Year competition that same year.

He enjoys anything related to sports and athletics and stays active with his busy lifestyle, which comes with being married with five children.

**Defendant Apt**

25.    Defendant Apt has served as the Company's CFO since January 1, 2024. Defendant Apt previously served as PACS' President of Corporate Finance and Treasurer from April 2018 until January 2023, and as Executive Vice President, Chief Investment Officer, and Treasurer from January 2023 until January 2024.

26.    The Company's website states the following about Defendant Apt:

Derick is the Chief Financial Officer at PACS, a national leader in post-acute care back-office and consulting resources that enable facility-level professionals and clinicians to focus on patient care, well-being and quality of life. He has a background in overseeing cash and debt management, as well as leading property investments, new business acquisitions, and divestures. Prior to his current role, Derick held positions in treasury departments at Intermountain Healthcare and Goldman Sachs before becoming Treasury and Finance Manager at Vivint, Inc., a NYSE-traded home technology company.

Derick has a bachelor's degree in Biological Engineering from the University of Missouri and an MBA with an emphasis in international banking from the George Washington University.

In addition to his love of finance, Derick enjoys skiing, cycling, hiking, traveling, and spending time with his wife and 3 children.

**Defendant Dilsaver**

27.    Defendant Dilsaver has served as a Company director since May 13, 2024. She also serves as the Chair of the Nominating and Corporate Governance Committee, as a member of the Compensation Committee, and as a member of the Audit Committee.

28.    The Company's website states the following about Defendant Dilsaver:

Evelyn Dilsaver is a prominent leader in both the public and nonprofit sectors, with experience in marketing, strategy, and business development. She spent nearly two decades in the audit and finance function as Controller for First Nationwide Bank, as well as Controller for Charles Schwab. Following, she went on to become Chief Financial Officer and Chief Administrative Officer for U.S. Trust, and later served as President and CEO of Charles Schwab Investment Management, where she grew assets to over $200 billion and generated over $1 billion in company revenue.

Today, Evelyn leverages her expertise and leadership in a variety of corporate and nonprofit Board roles, including Tempur Sealy (TPX), Health Equity (HQY), QuidelOrtho (QDEl), Bailard REIT, and the global consulting firm Proviti, in addition to PACS. She previously served as Board Chair for The Commonwealth Club, Board Chair for the Blue Shield of California Foundation, and Co-Chair of the Women Corporate Directors Advisory Board, as well as a Board member of Blue Shield of California, Long Drugs, Tamalpais, Bancorp, Aeropostale, High Mark Funds and the National Association of Corporate Directors, Northern California Chapter.

### Defendant Hancock

29.    Defendant Hancock founded in the Company in 2013 and has served as its Executive Vice Chairman since January 1, 2024. Defendant Hancock previously served as CFO of the Company from January 2013 until January 2024. According to the Prospectus filed with the SEC in connection with the Company's secondary public offering, upon the Company's secondary public offering, Defendant Hancock beneficially owned 54,626,199 shares of the Company's common stock, representing 35.2% of the Company's voting power. As a result, Defendant Hancock was a controlling shareholder of the Company.

30.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Hancock made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
| --- | --- | --- | --- |

| April 15, 2024 | 1,607,142 | $21 | $33,749,982 |
| September 9, 2024 | 8,128,352 | $36.25 | $294,652,760 |

Thus, in total, before the fraud was exposed, he sold 9,735,494 shares of Company stock on inside information, for which he received approximately $328,402,742 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

31.    The Company's website states the following about Defendant Hancock:

Mark is the Executive Vice Chairman, former Chief Financial Officer and one of two founders/owners of PACS Group Inc., a rapidly growing national platform investing in the continuum of post-acute care, including post-acute care professionals, ancillary services, and 315 post-acute facilities in 17 states across the country. In addition to over 20 years of experience as a finance professional Mark has previously worked as a licensed nursing home administrator in Utah, California, and Kentucky

Prior to starting PACS, Mark worked for Fortune 500 companies in the auto and steel industries and as the treasurer for a $20 billion financial services company. Mark was named a 2023 Mountain West Entrepreneur of the Year by Ernst & Young and was a finalist for their national Entrepreneur of the Year competition that same year. He is a Certified Treasury Professional (CTP) and holds a bachelor's degree in engineering from Brigham Young University, as well as a master's in business administration from Brigham Young University's Marriott School of Management.

When he's not focused on the skilled nursing industry, Mark enjoys spending time with his family, volunteering for his church, and expanding humanitarian efforts through his family's charitable foundation.

**Defendant Leavitt**

32.    Defendant Leavitt has served as the Company's Lead Independent Director since July 2023. He also serves as the Chair of the Compensation Committee, as a member of the Nominating and Corporate Governance Committee, and as a member of the Audit Committee.

33.    The Company's website states the following about Defendant Leavitt:

Taylor Leavitt is Managing Partner and CEO of Leavitt Equity Partners. He received an MBA from the UCLA Anderson School of Business and graduated magna cum laude from Utah State University with degrees in finance, economics, and international business. Taylor brings nearly 20 years of healthcare and finance experience and has been responsible for managing and executing the overall mission of LEP, its investment activities, and subsequent performance.

Before Leavitt Equity Partners, Taylor launched and led Leavitt Partners' (the consulting firm) Equity Practice which advised both private equity and hedge funds on healthcare investment opportunities and industry dynamics. Prior to joining Leavitt Partners, Taylor worked for ZARS Pharma, a venture capital funded pharmaceutical company, engaged in corporate acquisitions, licensing and business development operations. While at ZARS, he identified and executed strategic corporate transactions on a global basis, including mergers and acquisitions and IP and technology licenses.

Taylor enjoys spending time with his family, including supporting his four daughters' dance activities.

### Defendant Lewis

34.     Defendant Lewis has served as the Company's Executive Vice President and Chief

Accounting Officer since January 2023.

35.     The Company's website states the following about Defendant Lewis:

Michelle has served as our Executive Vice President, Chief Accounting Officer since January 2023. Since joining our company in July 2018, Ms. Lewis served in various roles of increasing responsibility, including as our Controller. Prior to that, Ms. Lewis, who is licensed as a Certified Public Accountant, owned and operated Michelle Lewis Accounting Services, PLLC, a certified public accounting firm, and also provided controller functions at a privately held healthcare organization, from January 2008 to May 2015. Ms. Lewis received a B.S. in Business Administration from the California State University East Bay. She has worked in the skilled nursing industry in various functions since 1997.

Michelle is married with two adult children and two spoiled dogs. She enjoys traveling, long walks/hikes with her husband, a newfound interest in snowshoeing, watching crime documentaries and is an avid reader of all things fiction.

### Defendant Millard

36.     Defendant Millard has served as a Company director since July 2023. She also

serves as Chair of the Audit Committee, as a member of the Compensation Committee, and as a member of the Nominating and Governance Committee.

37.    The Company's website states the following about Defendant Millard:

For nearly 29 years, Jacque Millard was the Vice President and Chief Investment Officer for Intermountain Healthcare where she led the investment department to invest more than $15 billion across multiple portfolios. Today, she is the Audit Committee Chair for PACS Group Inc. and Board Chair for FJI.

She is the former Board Chair for Youthlinc and has served on multiple endowment and foundation boards or investment committees, including Avent Health, Virginia Piper Trust, Westminster College, and Deseret Mutual Benefit Association. She is also a member of the National Association of Corporate Directors (NACD) and has completed the Director Professionalism certification.

Jacque's mission, to enhance investment performance and improve governance, is embodied in her professional and personal life. She brings her skill sets to foundations, family offices, and private companies to make a positive impact on their mission.  She is personally committed to seeking places where she can make a significant impact in the board room.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

38.    By reason of their positions as controlling shareholders, officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally.

39.    Each controlling shareholder, director, and/or officer of the Company owes to PACS and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the

- 13 -

highest obligations of fair dealing.

40.    The Individual Defendants, because of their positions of control and authority as controlling shareholders, directors, and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein or aided and abetted the same.

41.    To discharge their duties, the controlling shareholders, officers, and/or directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

42.    As controlling shareholders, senior executive officers, and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants at PACS had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

43.    To discharge their duties, the controlling shareholders, officers and/or directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the controlling

shareholders, officers and/or directors of the Company were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Utah, and the United States, and pursuant to PACS' own Code of Conduct and Business Ethics (the "Code of Ethics");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that the Company's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

44. Each of the Individual Defendants further owed to the Company and its shareholders the duty of loyalty requiring that each favor the Company's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

45. At all times relevant hereto, the Individual Defendants at PACS were the agents of each other and of the Company and were at all times acting within the course and scope of such agency.

46. Because of their advisory, executive, managerial, directorial, and controlling positions with the Company, each of the Individual Defendants had access to adverse, non-public information about the Company.

47. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

48. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants

caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

49.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Securities Act and Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

50.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of PACS' board of directors, each of the Individual Defendants who was a director of PACS was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

51.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing and was or should have been aware

of his or her overall contribution to and furtherance of the wrongdoing.

52.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and/or of the Company and was at all times acting within the course and scope of such agency.

## PACS' CODE OF ETHICS

53.     PACS represents that its Code of Ethics "serves as a guiding framework for our actions and decisions" and "helps to ensure that we conduct our business in an honest, ethical, and compliant manner, meeting all applicable clinical and other standards." The Code of Ethics also notes that it "applies to everyone at PACS, including [] all PACS-affililiated facilities and businesses and their respective employees, and contract workers, as well as all Company officers, and the Board of Directors."

54.     Under the heading titled "A Letter from Our CEO and CCO," the Code of Ethics states, in relevant part:

> We expect every member of the PACS family, including employees, contract workers, volunteers, officers, and the Board of Directors, to be familiar with the standards outlined in this Code. It is crucial that you understand how these standards apply to your role and responsibilities. Should you have any questions or require guidance, please do not hesitate to reach out to your supervisor, any member of PACS management, or the Compliance Department. Our Compliance Hotline is also available 24/7 at pacs.ethicspoint.com, via email at compliance@pacs.com, or by calling (833) 718-4953.

55.     Under the heading titled "Legal and Regulatory Compliance," the Code of Ethics states, in relevant part:

> Our Compliance Program represents a comprehensive effort to promote ethical and legal behavior. While detecting and preventing fraud, waste, abuse, and policy violations are key components of our Compliance Program, we also aim to provide employees with resources to help guide your conduct and answer your questions. To promote our compliance efforts, we established processes and procedures aimed

at ensuring we provide care to residents and patients, and otherwise conduct our business, in an honest and ethical manner, meeting all applicable clinical and other standards. We also have an Executive Compliance Committee that oversees our Compliance Program and supports our Chief Compliance Officer who reports to our Board of Directors. This Code is in addition to and provides an over-arching framework for our Employee Handbook and our other Policies and Procedures, all of which are part of our Compliance Program (in the event of an inconsistency between those policies and procedures and the Code, the Code shall prevail).

***

**Compliance with the Law**

We are reimbursed for many services rendered to our residents and patients under various federal and state programs and, as such, are subject to a variety of regulations and requirements imposed by federal and state legislation designed to prevent and address fraud and abuse, and recover losses resulting from fraudulent activity. We are committed to complying with all health, safety, environmental and employment laws. Our Policies and Procedures are written in accordance with these laws, and never supersede legal requirements.

**Preventing Fraud, Waste and Abuse**

We are committed to detecting and preventing fraud, waste and abuse. We have developed and implemented Policies and Procedures designed to ensure compliance with the laws that govern our operations as a healthcare provider. In addition to written Policies and Procedures, we provide education and training to employees, agents and contractors on fraud, waste and abuse, including applicable false claims laws, such as the federal False Claims Act and similar state laws.
The federal False Claims Act applies to Medicare and Medicaid program reimbursement and prohibits, among other things: billing for services not rendered; billing for undocumented services; falsifying cost reports; billing for medically unnecessary services; assigning improper codes to secure reimbursement or higher reimbursement; participating in kickback arrangements; and not refunding known overpayments.

Violating the federal False Claims Act may result in significant civil and administrative penalties. The submission of false or fraudulent claims may also result in monetary penalties, imprisonment, exclusion from participation in federal healthcare programs and loss of licensure.

56.    Under the heading titled "Legal and Regulatory Compliance," under the subheading "Insider Information and Securities Trading," the Code of Ethics states:

Trading on inside information is a violation of federal securities law. During the normal course of business or clinical activities, PACS employees may become aware of material non-public information about the Company or companies with whom we do business. Material information is information of such importance that it could influence a potential investor's decision to buy, sell or hold PACS securities or the securities of other publicly traded companies. This information, which can include details about mergers and acquisitions, financial results, business strategy, changes in executive management, and the like, should never be discussed with anyone outside of the Company and should only be used on a "need to know" basis with PACS colleagues.

Employees who receive material inside information about the Company or other publicly traded companies we do business with may not trade (which includes buying, selling, transferring, or gifting) the respective company's securities until the information is public. To use non-public information for personal financial benefit or to "tip" others, including family members, who might make an investment decision based on this information is not only unethical but also illegal under Federal law.

57.    Under the heading titled "Legal and Regulatory Compliance," under the subheading titled "Disclosures," the Code of Ethics states:

The information in the Company's public communications, including all reports and documents filed with or submitted to the SEC, must be full, fair, accurate, timely and understandable.

To ensure the Company meets this standard, all officers, directors, and other employees (to the extent they are involved in the Company's disclosure process) are required to maintain familiarity with the disclosure requirements, processes, and procedures applicable to the Company commensurate with their duties. All officers, directors and other employees are prohibited from knowingly misrepresenting, omitting, or causing others to misrepresent or omit, material facts about the Company to others, including the Company's independent auditors, governmental regulators, and self-regulatory organizations.

58.    Under the heading titled "Employee Matters and Workplace Conduct," the Code of Ethics, in relevant part, states:

**Conflicts of Interest**

A conflict of interest exists if you have an interest that interferes, or appears to interfere, with your responsibilities at work or may affect your judgment when

working on behalf of the Company. A conflict of interest may also exist if a member of your family receives an improper benefit as a result of your position at the Company. Our employees have a responsibility to put the interests of the Company and our residents and patients ahead of any other business or personal interests. Our employees should not engage in any activities that actually or potentially conflict with the Company's interests.

This Code does not attempt to describe all possible conflicts of interest that could develop. A few examples of potential conflict of interest situations may include:

•     An employee accepts outside employment from, or contracts with, an organization that does business with us or is a competitor of ours. While certain employees, such as nurses, therapists, and CNAs, are not prohibited from working shifts at another facility, this additional work must be disclosed to supervisors and should not interfere with the employee's work commitment to the Company or interfere with the employee's job performance at the Company.

•     An employee or relative has a material financial interest in a firm that does business with the Company.

•     An employee is related to another employee, particularly an employee who they report to or supervise.

•     An employee receiving compensation, in any form, from any source other than the Company for services he or she performed for the Company.

•     An employee taking up a management or other employment position with any firm or company that is in direct or indirect competition with the Company.

Potential conflicts of interest must be disclosed to supervisors upon hire or as they occur. Any material changes in the nature of conflict-of-interest situations after they are approved must also be reported. All reported conflicts must be reviewed by the Legal Department and approved by the Compliance Department. This includes any additional employment accepted while working for the Company if it presents an actual or potential conflict of interest. Potential conflicts of interest that are not approved by the Compliance Department may subject the individual to appropriate discipline by Human Resources, up to and including termination of employment, taking into account appropriate and relevant facts. When in doubt, it is best to disclose an actual or potential conflict of interest. All transactions that could give rise to a conflict of interest involving a director, executive officer or principal financial officer must be approved by the disinterested directors of the Board or a committee of the Board, and such approval will not be considered a waiver of this Code.

59.     Under the same heading, in a subheading titled "Fair Dealing," the Code of Ethics states:

All officers, directors and other employees should endeavor to deal fairly with the Company's customers, service providers, suppliers, competitors, and employees. No officer, director or other employee may take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any unfair dealing practice.

60.    Under the heading titled "Employee Obligations and Acknowledgement," in a subheading titled "Your Obligation to Report," the Code of Ethics states:

Reporting your concerns is important to the effectiveness of our Compliance Program. Under our Code of Conduct, you are required to report sincere concerns that fall within any of the following categories:

• Abuse or neglect of any resident or patient;
• Violations of federal or state laws or regulations regarding resident or patient care;
• Violations of federal or state laws or regulations regarding participation in Medicare, Medicaid, or other healthcare programs;
• Activities that otherwise violate applicable laws or regulations; and/or
• Activities that violate this Code of Conduct, our employee handbook, or any of our other policies and procedures. Furthermore, it is never acceptable to overlook or ignore actual or suspected wrongdoing.

61.    Under the heading "Consequences of Non-Compliance," the Code of Ethics states:

Failure to comply with laws and regulations may lead to serious consequences for you, your coworkers and to the Company. These consequences may include, among other things, termination of employment, licensure actions, individual lawsuits, government investigations and prosecutions, prison, fines against you and the Company, exclusion from working in healthcare or otherwise participating in state and federal healthcare programs, loss of credibility and loss of respect. Because failure to comply with laws and regulations can lead to serious consequences, disciplinary action up to and including termination of employment, will be taken against any employee for:

• Participating in or authorizing any violation of laws, regulations, our Code of Conduct or our policies and procedures
• Failing to report violations
 • Concealing violations
• Refusing to cooperate with an internal investigation
 • Threatening or retaliating against someone who reports a violation.

62.    In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Securities Act and the Exchange Act. Additionally, in violation of the Code of Ethics, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Ethics, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Ethics.

## PACS' AUDIT COMMITTEE CHARTER

63.    PACS defines the purpose of the Audit Committee as:

The purpose of the Audit Committee (the "Committee") is to assist the Board in its oversight of: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; and (iv) the performance of the Company's internal audit function and independent auditor. The Committee's responsibilities are limited to oversight. The Company's management is responsible for establishing and maintaining accounting policies and procedures in accordance with generally accepted accounting principles ("GAAP") and other applicable reporting and disclosure standards and for preparing the Company's financial statements. The Company's independent auditors are responsible for auditing and reviewing those financial statements.

64.    Under the heading "Duties and Responsibilities," in the subsection titled "Quarterly Financial Statements," the Audit Committee Charter states:

*Form 10-Q Review.* The Committee must review and discuss with management and the independent auditor the Company's quarterly financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

65.    Under the same heading, in the subsection titled "Other Duties and

Responsibilities," the Audit Committee Charter states, in relevant part:

> *Review of Earnings Releases.* The Committee must discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.
>
> ***
>
> *Complaint Procedures.* The Committee has approved the procedures set forth in the Company's Policies and Procedures for Complaints Regarding Accounting, Internal Accounting Controls, Fraud or Auditing Matters ("Whistleblower Policy") for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential and anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.
>
> ***
>
> *Review of Code of Business Conduct and Ethics.* The Committee must periodically consider and discuss with management and the independent auditor the Company's Code of Business Conduct and Ethics (the "Code") and the procedures in place to enforce the Code. The Committee must also consider and discuss and, as appropriate, grant requested waivers from the Code brought to the attention of the Committee; provided that the Committee may defer any decision with respect to any waiver to the Board.

66.     In violation of the Audit Committee Charter, the Individual Defendants (as key officers, directors, and controlling shareholders) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Securities Act and Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## **INDIVIDUAL DEFENDANTS' MISCONDUCT**

*Background of PACS*

67.    PACS was founded in 2013 and is one of the largest skilled nursing facilities ("SNF") and post-acute care facilities operators in the United States. Incorporated in Delaware and headquartered in Farmington, Utah, PACS currently operates in 16 states and has approximately 280 facilities that serve over 27,000 patients each day.

68.    PACS' revenue is heavily reliant on government funded programs such as Medicare and Medicaid. In 2022 and 2023, Medicare and Medicaid accounted for over 70% of PACS' total revenue. In 2022, Medicare made up 47.6% of PACS' revenue and Medicaid made up 30.2% of PACS' revenue. In 2023, Medicare made up 38.6% of PACS' revenue and Medicaid made up 37.6% of PACS' revenue.

69.    However, the payment PACS receives from Medicare can increase depending on whether PACS is treating beneficiaries who require a higher level of skilled care. The Center for Medicare and Medicaid Services ("CMS") defines a higher level of skilled care service as services like nursing or rehabilitation that "require the skills of qualifies technical or professional health personnel." PACS states that patients who receive a higher level of care drive its financial sustainability while lower-acuity patients result in lower payments.

70.    Medicare beneficiaries who require a higher level of skilled care can drive up to three times more revenue per day than Medicaid for an SNF. Typically, in order for a patient to qualify as needing a higher level of skilled care under Medicare the patient must typically "have spent a minimum of three consecutive inpatient days in the hospital." During the COVID-19 pandemic, the CMS waived this requirement in order to reduce hospital overcrowding, allowing patients to access Medicare benefits if the patient showed a need for skilled nursing care (the

"COVID Waiver"). Under the COVID Waiver, potential COVID exposure and even a positive COVID test result did not qualify the patient for higher skilled care benefits. But PACS shifted patients from Medicaid to Medicare just because the patient had minimal exposure to COVID. This practice allowed PACS revenue to be comprised of Medicare at a significantly higher rate than its competitors and as a result dramatically drove up revenues at no additional cost.

71.    From 2021 to 2023 PACS more than doubled its net income, from $47 million to almost to $112 million as a result of the COVID waiver and placed itself at the forefront of the SNF market. However, when the COVID Waiver expired in mid-2023, PACS' revenue sharply declined. To mask this sharp decline and to attempt to get back to COVID era levels of profitability, PACS began fraudulently billing for unnecessary treatments and for services never provided to patients.

72.    On March 13, 2024, PACS filed its registration statement to the SEC for its April 2024 initial public offering (the "IPO") on Form S-1 which was later declared effective on April 10, 2024 ("IPO Registration Statement"). On April 12, 2024, PACS filed the IPO Prospectus on Form 424B4 to the SEC, which formed part of the IPO Registration Statement (collectively, with attendant materials filed or published with these forms, the "IPO Materials"). PACS issued 21,428,572 shares of common stock at $21.00 per share which netted the Company proceeds of $450 million. Through the IPO, Defendants Murray and Hancock sold 3,214,284 shares of their common stock at $21 for proceeds of $67.5 million.

73.    On September 3, 2024, PACS filed a registration statement for a secondary offering on Form S-1 (the "SPO Registration Statement") to the SEC. On September 6, 2024, PACS filed a prospectus for the SPO on Form 424B4 to the SEC, which formed part of the SPO Registration

Statement (the "SPO Prospectus" and together with the SPO Registration Statement and attendant materials filed or published with these forms, the "SPO Materials"). During the SPO, PACS issued 2,777,778 shares of common stock at $36.25 per share which netted the Company $100.7 million in proceeds. Through the SPO, Defendants Murray and Hancock sold 16,256,704 shares of common stock at $26.25 per share for proceeds of $589.3 million.

**False and Misleading Statements**

***April 11, 2024 IPO***

74.     On April 11, 2024, the Company's stock began to trade publicly on the NYSE. The IPO Materials emphasized that PACS' success and growth relied on, among other things, its ability to attract higher-acuity patients, stating:

> Our business model, like those of some other for-profit operators, is based in part on attracting higher-acuity patients whom we believe provide us more opportunity to be profitable due to the higher level of services they need and accordingly higher reimbursement rates, and over time our overall patient mix has consistently shifted to higher-acuity and higher-resource utilization patients in most facilities we operate.

75.     The IPO Materials additionally stated that PACS' recent growth was a result of its ability to acquire underperforming SNFs and to transform them into more valuable short-term transitional care SNFs, stating:

> Our significant historical growth has been primarily driven by implementing our expertise in acquiring underperforming long-term custodial care SNFs and converting them into higher acuity, high value-add short-term transitional care SNFs.

76.     The IPO Materials also recognized the strict regulatory compliance obligations PACS faced and discussed the risks associated with the Company failing to meet such compliance obligations, stating:

We operate in a highly regulated industry with stringent regulatory compliance obligations, which requires robust regulatory compliance operations. ***Failure to operate in compliance with applicable laws and regulations could require significant expenditures and result in regulatory deficiencies and other regulatory penalties.*** PACS Services functions to support our regulatory compliance obligations across our organization, including through controlled billing and cost reporting practices and legal, risk management, and compliance support.

77.    In addition, the IPO Materials highlighted the importance the Company placed on

meeting its compliance obligations, stating:

> ***Robust culture of compliance.*** We focus on instilling a unified, cohesive culture of innovation and compliance that we believe provides consistency in our results and confidence in our facilities as an attractive care option for patients. Our rigorous approach to billing integrity, our independent internal compliance function, and our regular facility billing audits are intended to provide a foundation of trust and collaboration that makes us a natural choice for payors.
>
> * * *
>
> We believe our technology and internally developed dashboards help to facilitate better patient care, risk management, regulatory compliance, staffing, and resource allocation.
>
> * * *
>
> We also believe our size and scale has provided us with the ability to negotiate favorable contracts with managed care and other payor sources, the ability to navigate stringent regulatory compliance obligations and withstand potential reimbursement and regulatory industry dynamics, and the ability to leverage real estate value for liquidity and growth.

78.    The IPO Materials also emphasized how PACS was meeting its compliance

obligations, stating:

> We have internal compliance professionals and invest in other resources to help us comply with various requirements of federal and private healthcare programs.
>
> * * *
>
> Our compliance program includes, among other things, (1) policies and procedures that take into account applicable laws, regulations, sub-regulatory guidance and industry practices and customs that govern the clinical, reimbursement and operational aspects of our operating subsidiaries; (2) training about our compliance process for employees throughout our organization, our directors and officers, and training about Medicare and Medicaid laws, fraud and abuse prevention, clinical standards and practices, and claim submission and reimbursement policies and

- 28 -

procedures for appropriate employees; and (3) internal controls that monitor, among other things, the accuracy of claims, reimbursement submissions, cost reports and source documents, provision of patient care, services, and supplies as required by applicable standards and laws, accuracy of clinical assessment and treatment documentation, and implementation of judicial and regulatory requirements (i.e., background checks, licensing and training).

79.    With respect to the measures PACS would take to rectify any compliance errors, the IPO Materials stated:

> While we have not experienced any material compliance issues to date, from time to time, our systems and internal controls highlight potential compliance issues, which we investigate as they arise. We similarly investigate concerns that are reported to us by employees or other persons. When errors or compliance failures are identified, we seek to rectify them as appropriate.

80.    The IPO Materials also contained the following statement regarding the Company's risk factors:

> We depend upon reimbursement from third-party payors, and our revenue, financial condition and results of operations could be negatively impacted by any changes in the acuity mix of patients in our facilities as well as changes in payor mix and payment methodologies and new cost containment initiatives by third-party payors.
>
> * * *
>
> We face numerous risks related to expiration of the COVID-19 public health emergency (PHE) expiration and surrounding wind-down and uncertainty, which could, individually or in the aggregate, have a material adverse effect on our business, financial condition, liquidity, results of operations and prospects.
>
> * * *
>
> We review and audit the care delivery, recordkeeping and billing processes of our operating subsidiaries. These reviews from time to time detect instances of noncompliance that we attempt to correct, which in some instances requires reduced or repayment of billed amounts or other costs.
>
> * * *
>
> If we do not achieve or maintain competitive quality of care ratings from CMS or private organizations engaged in similar rating activities, our business may be negatively affected.
>
> * * *
>
> We rely on payments from third-party payors, including Medicare, Medicaid and other governmental healthcare programs and private insurance organizations. If coverage or reimbursement for services are changed, reduced or eliminated, including through cost-containment efforts, spending requirements are changed,

data reporting, measurement and evaluation standards are enhanced and changed, our operations, revenue and profitability could be materially and adversely affected.

81.     The statements in ¶¶74-80 above were materially false and misleading and failed to disclose, *inter alia*, that: (i) PACS misclassified lower value Medicaid patients in order to shift them over to the more valuable Medicare benefits in violation of COVID Waiver rules; and (ii) PACS' risk disclosures mischaracterized adverse facts that the Company was actually facing as only mere possibilities.

82.     The IPO Registration Statement reported that, for the year ended December 31, 2023, the Company "generated total net income of $112.9 million, total operating expense of $2.9 billion and Adjusted EBITDA of $237.5 million, representing a CAGR [compound annual growth rate] of 53.4%, 63.7%, and 51.1%, respectively, over the last three years." Specifically, the IPO Registration Statement stated:

> ***For the year ended December 31, 2023, we generated total revenue of $3.1 billion, representing a CAGR of 63.3% over the last three years.*** A substantial portion of our revenue is generated from payments from third-party payors, including Medicare and Medicaid, which represent our largest sources of revenue and accounted for 38.6% and 37.6% of our routine revenue for the year ended December 31, 2023, respectively. ***For the year ended December 31, 2022, we generated revenue of $2.4 billion***, and Medicare and Medicaid accounted for 47.6% and 30.2% of our total revenue, respectively. ***For the year ended December 31, 2023, we generated total net income of $112.9 million, total operating expense of $2.9 billion and Adjusted EBITDA of $237.5 million, representing a CAGR of 53.4%, 63.7%, and 51.1%, respectively, over the last three years***. For the year ended December 31, 2022, our total operating expenses were $2.2 billion, and we generated net income of $150.5 million and Adjusted EBITDA of $255.5 million.

83.     The IPO Registration Statement also reported the Company's combined and consolidated financials as of the years ended December 31, 2021, 2022, and 2023, stating:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| | (in thousands, except share and per share data) | | |
| Revenue | | | |
| Patient and resident service revenue | $ 3,110,114 | $ 2,399,155 | $ 1,135,909 |
| Additional funding | $ 375 | $ 21,482 | $ 28,563 |
| Other revenues | $ 1,003 | $ 1,357 | $ 2,091 |
| Total Revenue | $ 3,111,492 | $ 2,421,994 | $ 1,166,563 |
| Expenses | | | |
| Cost of services | $ 2,447,713 | $ 1,861,314 | $ 901,095 |
| Rent-cost of services | $ 216,711 | $ 160,003 | $ 78,122 |
| General and administrative expense | $ 213,664 | $ 149,006 | $ 96,834 |
| Depreciation and amortization | $ 25,632 | $ 22,311 | $ 7,153 |
| Total Operating Expenses | $ 2,903,720 | $ 2,192,634 | $ 1,083,204 |
| Operating Income | $ 207,772 | $ 229,360 | $ 83,359 |
| Other (expense) income | | | |
| Interest expense | $ (49,919) | $ (25,538) | $ (5,278) |
| Other income, net | $ (536) | $ 3,223 | $ 3,345 |
| Total Other Expense, net | $ (50,455) | $ (22,315) | $ (1,933) |
| Income before provision for income taxes | $ 157,317 | $ 207,045 | $ 81,426 |
| Provision for income taxes | $ (44,435) | $ (56,549) | $ (33,479) |
| Net income | $ 112,882 | $ 150,496 | $ 47,947 |
| Less: | | | |
| Net income attributable to noncontrolling interest | $ 8 | $ — | $ — |
| Net income attributable to PACS Group, Inc. | $ 112,874 | $ 150,496 | $ 47,947 |
| | | | |
| Net income per share - basic and diluted | $ 0.88 | $ 1.17 | $ 0.37 |
| | | | |
| Shares used in computing net income per share - basic and diluted | 128,723,386 | 128,723,386 | 128,723,386 |

\*\*\*

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| | (Dollars in thousands) | | |
| **Key Skilled Services Metrics** | | | |
| Skilled nursing services revenue | $ 3,092,577 | $ 2,391,309 | $ 1,133,103 |
| Skilled mix by revenue | 55.1 % | 64.1 % | 57.8 % |
| Skilled mix by nursing patient days | 32.4 % | 40.7 % | 34.5 % |
| Occupancy for skilled nursing services: | | | |
|   Available patient days | 7,457,345 | 5,719,689 | 3,106,602 |
|   Actual patient days | 6,775,063 | 5,139,736 | 2,681,927 |
|   Occupancy rate (operational beds) | 90.9 % | 89.9 % | 86.3 % |
| Number of facilities at period end | 203 | 150 | 138 |
| Number of operational beds at period end | 22,950 | 16,345 | 14,841 |
| **Non-GAAP Financial Measures** | | | |
| *Performance Measures* | | | |
| EBITDA[1] | $ 232,860 | $ 254,894 | $ 93,857 |
| Adjusted EBITDA[1] | $ 237,486 | $ 255,516 | $ 104,073 |
| *Valuation Measure* | | | |
| Adjusted EBITDAR[1] | $ 454,197 | | |

84.    The IPO Registration Statement additionally reported that, during the years ended December 31, 2021, 2022, and 2023, "*Medicare and Medicaid represented [the Company's] largest sources of revenue*" and that "*[s]killed nursing services revenue reflects the portion of patient and resident service revenue generated from all patient in skilled nursing facilities.*" Specifically, the IPO Registration Statement stated, in relevant part:

> For the year ended December 31, 2023, *Medicare and Medicaid represented our largest sources of revenue and accounted for 38.6% and 37.6% of our routine revenue* for the year ended December 31, 2023, respectively.
>
>        * * *
>
> Skilled nursing services revenue — *Skilled nursing services revenue reflects the portion of patient and resident service revenue generated from all patients in skilled nursing facilities*, excluding revenue generated from our assisted and independent living services.
>
> Skilled mix — We measure both revenue and nursing patient days by payor. *Medicare and managed care patients, whom we refer to as high acuity patients, typically require a higher level of skilled nursing care. As a result, Medicare and managed care reimbursement rates are typically higher than those from other*

*payors. In most states, Medicaid reimbursement rates are generally the lowest of all payor types. Changes in the payor mix can significantly affect our revenue and profitability.* To monitor this performance, we evaluate two different measures of skilled mix:

* * *

The following tables present the above key skilled services metrics by category for all facilities, Mature facilities, Ramping facilities and New facilities as of and for the years ended December 31, 2023, 2022 and 2021:

| | Year ended December 31, | | | Growth Rate for the year ended December 31, | |
|---|---|---|---|---|---|
| | 2023 | 2022 | 2021 | 2023 | 2022 |
| | | (Dollars in thousands) | | | |
| **Total facility results:** | | | | | |
| Skilled nursing services revenue | $ 3,092,577 | $ 2,391,309 | $ 1,133,103 | 29.3 % | 111.0 % |
| Skilled mix by revenue | 55.1 % | 64.1 % | 57.8 % | (9.0)% | 6.3 % |
| Skilled mix by nursing patient days | 32.4 % | 40.7 % | 34.5 % | (8.3)% | 6.2 % |
| Occupancy for skilled nursing services: | | | | | |
| Available patient days | 7,457,345 | 5,719,689 | 3,106,602 | 30.4 % | 84.1 % |
| Actual patient days | 6,775,063 | 5,139,736 | 2,681,927 | 31.8 % | 91.6 % |
| Occupancy rate (operational beds) | 90.9 % | 89.9 % | 86.3 % | 1.0 % | 3.6 % |
| Number of facilities at period end | 203 | 150 | 138 | 35.3 % | 8.7 % |
| Number of operational beds at period end | 22,950 | 16,345 | 14,841 | 40.4 % | 10.1 % |

85.     The IPO Registration Statement also detailed the purported number of licensed professionals the Company employed, including registered nurses ("RNs"), licenses practical nurses ("LPNs"), and certified nursing assistants ("CNAs"). Specifically, the IPO Registration Statement, in relevant part, stated:

As of December 31, 2023, we had 32,433 employees working across 208 post-acute care facilities in 9 states and at our corporate headquarters in Farmington, Utah. Of our 32,433 employees, 19,321 are clinicians, including approximately ***2,244 RNs including DONs, approximately 5,355 LPNs, and approximately 11,722 CNAs.*** Approximately 13,112 of our employees work in nonclinical functions and administrative / support functions, including 14 RVPs, and ***150 facility administrators***, 143 clinical and compliance support, 72 information technology support, and approximately 12,733 additional administrative and support staff. We also employ a dedicated team specifically focused on ensuring smooth functioning and support for our point-of-care including the clinical and compliance support, information technology support above. Additionally, 3,478 of our employees were represented by unions under collective bargaining agreements as of December 31, 2023.

86.    The IPO Registration Statement also reported that the Company's "facilities must comply with required conditions of participation in the Medicare program and state Medicaid programs and state licensure requirements" and stated that *if* the Company were to "fail to comply with substantially with licensure and certification laws, rules and regulations, the facility *could* lose its certification as a Medicare or Medicaid provider, or lose its license permitting operation in the State." The IPO Registration Statement, in relevant part, stated:

*Licensure and Certification*

***Our facilities and healthcare professionals are subject to various federal, state, and local licensure and certification requirements in connection with our provision of healthcare services.*** Certain states in which we operate have certificate of need or similar programs regulating the establishment or expansion of healthcare facilities. The initial and continued licensure of our facilities and certification to participate in government healthcare programs depends upon many factors including various state licensure regulations relating to quality of care, environment of care, equipment, services, minimum staffing requirements, staff training, personnel, and the existence of adequate policies, procedures, and controls. In addition to facility licensure requirements, states also impose licensing requirements on the healthcare professionals who provide services at our facilities. States may impose restrictions on, or revoke, licenses of healthcare providers for, among other things, improper clinical conduct and delegation of such services, patient mistreatment, ethical violations and substance abuse, or aiding and abetting the unlicensed practice of medicine.

* * *

***If our independent operating subsidiaries fail to comply with these directives or otherwise fail to comply substantially with licensure and certification laws, rules and regulations, the facility could lose its certification as a Medicare or Medicaid provider, or lose its license permitting operation in the State.***

87.    The statements contained in ¶¶82-86 above were materially false and misleading and failed to disclose, *inter alia*, that: (i) PACS was artificially inflating its revenues to COVID-era profitability levels by fraudulently billing for unnecessary treatments and services never provided to patients; (ii) the Company was misclassifying its employees' licensure in violation of

the Company's licensure obligations; and (iii) PACS' Medicare revenues were a result of violating the COVID Waiver by improperly shifting Medicaid patients to Medicare benefits.

### *May 13, 2024 Press Release and Form 10-Q*

88.     On May 13, 2024, the Company issued a press release announcing its financial results for the first fiscal quarter of 2024 (the "May 2024 Press Release"). In relevant part, the May 2024 Press Release stated:

> **Highlights**:
>
> • **GAAP earnings per share for the quarter was $0.38, an increase of 31.0% over the prior year quarter.**
> • **GAAP net income was $49.1 million, an increase of 30.7% over the prior year quarter.**
> • **Consolidated GAAP revenue for the quarter was $934.7 million, an increase of 31.9% over the prior year quarter.**
> • EBITDA and Adjusted EBITDA for the quarter was $96.3 million and $88.5 million, representing increases of 47.0% and 34.0%, respectively, over the prior year quarter. Adjusted EBITDAR for the quarter was $152.5 million.
>
> **Select KPIs**:
>
> • Total Facilities occupancy was 91.1% during the first quarter of 2024. Ramping and Mature Facilities occupancy increased by 1.8% and 1.4%, respectively, over the prior year quarter.
> • **Average Medicare and Medicaid daily rates increased 11.0% and 5.3%, respectively, for the three months ended March 31, 2024, as compared to the prior year quarter.**
> • **In the three months ended March 31, 2024 we added 10 operating facilities, including 1,334 and 174 skilled nursing and assisted living beds, respectively.**
>
> **Business Outlook**
>
> Based on information available as of May 13, 2024, PACS is providing the following guidance for full year 2024:
>
> • **Revenue of $3.65 billion to $3.75 billion**
> • Adjusted EBITDA of $351 million to $361 million

89.     On the same day, the Company filed its Form 10-Q for the first fiscal quarter of 2024 with the SEC (the "1Q 2024 10-Q"), which was signed by Defendants Murray and Apt and attached certifications pursuant to Sections 13a-15(e) and 15d-15(e) of the Exchange Act and Section 302 of the Sarbanes-Oxley Act of 2002 (the "SOX Certifications"). In the SOX Certifications, Defendants Murray and Apt attested to the accuracy of the 1Q 2024 10-Q.

90.     The 1Q 2024 10-Q stated that the Company's "patient and resident service revenue is derived primarily from the Company's applicable subsidiaries providing healthcare services to their respective patients and residents" and that such *"[r]evenue is recognized when services are provided.*" The 1Q 2024 10-Q further stated that, for "[t]he healthcare services in skilled patient contracts," *"[r]evenue is recognized as the performance obligations are satisfied.*" In relevant part, the 1Q 2024 10-Q stated:

> ***Patient and resident service revenue - Patient and resident service revenue increased by $226.5 million to $934.3 million for the three months ended March 31, 2024, a 32.0% increase compared to the three months ended March 31, 2023.*** For the three months ended March 31, 2024 and 2023, skilled nursing services revenue represented more than 99.0% of patient and resident service revenue.
>
> ***Skilled nursing services revenue increased by 31.4%, or $221.9 million, to $927.5 million for the three months ended March 31, 2024, compared to the three months ended March 31, 2023. This change was driven by an increase in operational beds of 5,194 from March 31, 2023 to March 31, 2024 leading to a 35.3% increase in patient days year-over-year***. Additionally we experienced a consistent occupancy rate across all facilities of 91.1% for the three months ended March 31, 2024, compared to 91.8% for the three months ended March 31, 2023, following continued execution on our business model.
>
> * * *
>
> **NOTE 3. REVENUE AND ACCOUNTS RECEIVABLE**
>
> *Patient and Resident Service Revenue*

The Company's *patient and resident service revenue is derived primarily from the Company's applicable subsidiaries providing healthcare services to their respective patients and residents. Revenue is recognized when services are provided to the patients* at the amount that reflects the consideration to which the Company expects to be entitled. These amounts are due from residents, third-party payors (including health insurers and government payors), and others and includes variable consideration for retroactive revenue adjustments due to settlement of audits and other reviews by the payor. Generally, the licensed healthcare provider entity providing the applicable services bills the applicable payors monthly.

*The healthcare services in skilled patient contracts include routine services in exchange for a contractual agreed-upon amount or rate. Revenue is recognized as the performance obligations are satisfied.*

*Performance obligations are determined based on the nature of the services provided by the applicable licensed healthcare provider entity. Revenue for performance obligations satisfied over time is recognized based on actual charges in relation to total expected (or actual) charges.* The Company believes that this method provides a faithful depiction of the transfer of services over the term of the performance obligation based on the inputs needed to satisfy the obligation.

\* \* \*

**Medicaid**: Payments for skilled nursing facility services rendered to Medicaid (including Medi-Cal, which is the name of the state Medicaid program in California) program beneficiaries are based on an annually established daily reimbursement rate for eligible stays. The rate is adjusted annually. The final settlement is determined after submission of an annual cost report and audits thereof by Medicaid. *Revenue from the Medicaid program amounted to 38.8% and 30.3% of the Company's condensed combined/consolidated net patient and resident revenue* for the three months ended March 31, 2024 and 2023, respectively.

**Medicare**: Payments for skilled nursing facility services rendered to Medicare program beneficiaries are based on prospectively determined daily rates which vary according to a patient diagnostic classification system. The applicable licensed healthcare provider entity is paid for certain reimbursable services at the approved rate with final settlement determined after submission of the annual cost report and audit thereof by the designated Medicare fiscal intermediary*. Revenue from the Medicare program amounted to 35.7% and 48.1% of the Company's condensed combined/consolidated net patient and resident revenue* for the three months ended March 31, 2024 and 2023, respectively.

\* \* \*

The following tables present the above key skilled services metrics by category for

- 37 -

all facilities, Mature facilities, Ramping facilities and New facilities as of and for the three months ended March 31, 2024 and 2023:

| | Three Months Ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | 2024 | 2023 | Change | % Change |
| | (Dollars in thousands) | | | |
| **Total facility results:** | | | | |
| Skilled nursing services revenue | $ 927,456 | $ 705,574 | $ 221,881 | 31.4 % |
| Skilled mix by revenue | 52.0 % | 63.7 % | | (11.7)% |
| Skilled mix by nursing patient days | 29.8 % | 40.3 % | | (10.5)% |
| **Occupancy for skilled nursing services:** | | | | |
| Available patient days | 2,164,061 | 1,586,384 | 577,677 | 36.4 % |
| Actual patient days | 1,970,602 | 1,456,412 | 514,190 | 35.3 % |
| Occupancy rate (operational beds) | 91.1 % | 91.8 % | | (0.7)% |
| Number of facilities at period end | 212 | 174 | 38 | 21.8 % |
| Number of operational beds at period end | 24,315 | 19,121 | 5,194 | 27.2 % |

The following table presents average daily rates by payor source, excluding services that are not covered by the daily rate, for the three months ended March 31, 2024 and 2023:

| | Three Months Ended March 31, | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Mature | | Ramping | | New | | Total | |
| | 2024 | 2023 | 2024 | 2023 | 2024 | 2023 | 2024 | 2023 |
| Medicare | $937.66 | $845.94 | $968.59 | $836.27 | $917.80 | $863.92 | $949.23 | $855.41 |
| Managed care | 601.48 | 569.00 | 660.85 | 587.46 | 558.19 | 604.14 | 614.99 | 589.76 |
| *Total for skilled patient payors* [1] | *794.16* | *758.81* | *843.08* | *733.66* | *721.10* | *777.52* | *800.91* | *767.90* |
| Medicaid | 295.05 | 283.07 | 308.88 | 256.67 | 308.60 | 296.15 | 304.70 | 289.23 |
| Private and other | 380.32 | 299.68 | 408.15 | 278.98 | 354.26 | 350.11 | 382.61 | 326.93 |
| *Total* [2] | *$464.08* | *$484.08* | *$500.21* | *$440.48* | *$401.37* | *$489.75* | *$459.83* | *$485.00* |

91.    In addition, the 1Q 2024 10-Q reported on the Company's licensure and certification requirements and the implications that a failure to meet these requirements would have on the Company, stating:

***Licensure and Certification***

***Our facilities and healthcare professionals are subject to various federal, state, and local licensure and certification requirements in connection with our***

- 38 -

*provision of healthcare services.* Certain states in which we operate have certificate of need or similar programs regulating the establishment or expansion of healthcare facilities. The initial and continued licensure of our facilities and certification to participate in government healthcare programs depends upon many factors including various state licensure regulations relating to quality of care, environment of care, equipment, services, minimum staffing requirements, staff training, personnel, and the existence of adequate policies, procedures, and controls. In addition to facility licensure requirements, states also impose licensing requirements on the healthcare professionals who provide services at our facilities. States may impose restrictions on, or revoke, licenses of healthcare providers for, among other things, improper clinical conduct and delegation of such services, patient mistreatment, ethical violations and substance abuse, or aiding and abetting the unlicensed practice of medicine.

*  *  *

***If our independent operating subsidiaries fail to comply with these directives or otherwise fail to comply substantially with licensure and certification laws, rules and regulations, the facility could lose its certification as a Medicare or Medicaid provider, or lose its license permitting operation in the State.***

92.     The 1Q 2024 10-Q also reported that the Company "***review[s] and audit[s] the care delivery, recordkeeping and billing process of our operating subsidiaries***," maintains "***internal compliance professionals and [] other resources to help us comply with various requirements of federal and private healthcare programs***" and has "***not experienced any material compliance issues to date***." The 1Q 2024 10-Q, in relevant part, stated:

> ***We review and audit the care delivery, recordkeeping and billing processes of our operating subsidiaries. These reviews from time to time detect instances of noncompliance that we attempt to correct, which in some instances requires reduced or repayment of billed amounts or other costs.***
>
> ***We have internal compliance professionals and invest in other resources to help us comply with various requirements of federal and private healthcare programs.*** Our compliance program includes, among other things, (1) policies and procedures that take into account applicable laws, regulations, sub-regulatory guidance and industry practices and customs that govern the clinical, reimbursement and operational aspects of our operating subsidiaries; (2) training about our compliance process for employees throughout our organization, our directors and officers, and training about Medicare and Medicaid laws, fraud and abuse prevention, clinical standards and practices, and claim submission and reimbursement policies and procedures for appropriate employees; and (3) internal controls that monitor,

- 39 -

among other things, the accuracy of claims, reimbursement submissions, cost reports and source documents, provision of patient care, services, and supplies as required by applicable standards and laws, accuracy of clinical assessment and treatment documentation, and implementation of judicial and regulatory requirements (i.e., background checks, licensing and training).

***While we have not experienced any material compliance issues to date***, from time to time, our systems and internal controls highlight potential compliance issues, which we investigate as they arise. We similarly investigate concerns that are reported to us by employees or other persons. When errors or compliance failures are identified, we seek to rectify them as appropriate.

93.     The statements in ¶¶88-92 above were materially false and misleading and failed to disclose, *inter alia*, that: (i) PACS had been artificially inflating its revenues to COVID-era profitability levels by fraudulently billing patients for unnecessary and never used medical treatment; and (ii) PACS' revenue derived from Medicare patients in the first half of 2023 was improperly reported because the Company was misclassifying patients in order to get them to obtain Medicare benefits.

***May 14, 2024 Earnings Call***

94.     On May 14, 2024, the Company hosted an earnings call to discuss its financial results for the first fiscal quarter of 2024 (the "1Q 2024 Earnings Call"). During the 1Q 2024 Earnings Call, Defendant Murray stated:

Our revenue was driven higher by several factors when compared with the same quarter last year. In addition to increasing occupancy, we also saw revenue per patient day increases.

*     *     *

Outlook for continued growth remains strong, with a robust acquisition pipeline and continued improvement both clinically and financially in the operations we've recently acquired.

95.     Also during the 1Q 2024 Earnings Call, Defendant Apt stated:

We attribute our revenue growth to adding 5,194 beds to the company over the past year, which represents 35.3% increase in patient days. Additionally, we realized a meaningful improvement on our revenue per patient day over the same time period. We continued the growth of our overall bed count into the first quarter of this year with adding 10 new operations. Our local teams have been making clinical improvements, which is leading to increased occupancy and stabilization of the financial performance of these facilities.

Additionally, our average Medicare revenue per patient day remained strong through Q1 at both our Ramping and Mature facilities at $969 and $938 respectively, compared to '23 where our average Medicare revenue per patient day at Ramping and Mature was 836 and 846, respectively.

96.     The statements in ¶¶94-95 above were materially false and misleading and failed to disclose, *inter alia*, that the Company's revenues were artificially high because the Company was fraudulently billing patients for unnecessary and unused medical treatments in order to maintain COVID-era profitability.

### May 21, 2024 Amendment to Form 10-Q

97.     On May 21, 2024, the Company filed an amendment for the 1Q 2024 10-Q with the SEC (the "1Q Amendment"). The 1Q Amendment was to correct an administrative error in the number of shares of common stock outstanding as of May 10, 2024, as set forth in the 1Q 2024 10-Q. The 1Q Amendment affirmed the previously reported financial results in all material respect to those in the 1Q 2024 Form 10-Q.

98.     The disclosures made in the 1Q Amendment were materially false and misleading because, in reality: (i) PACS had been artificially inflating its revenues to COVID-era profitability levels by fraudulently billing patients for unnecessary and never used medical treatment; and (ii) the revenue PACS derived from the Medicare patients in the first half of 2023 was improper because the Company was misclassifying patients in order to get them to obtain Medicare benefits.

### August 12, 2024 Press Release and Form 10-Q

99.    On August 12, 2024, the Company issued a press release announcing its financial results for the second fiscal quarter of 2024 (the "August 2024 Press Release"). Defendant Murray was quoted in the August 2024 Press Release as stating the following, in relevant part:

> We had another strong quarter, again highlighted by 165 of our facilities having a 4 or 5 star CMS Quality Measures rating. We believe this is a key driver of our revenue growth in the second quarter of 2024 of 29.1% or $221.2 million as compared to the second quarter of 2023.

100.    In relevant part, the August 2024 Press Release also stated:

> **Highlights:**
>
> • **GAAP net income (loss) was $38.2 million for the six months ended June 30, 2024** and $(10.9) million for the second quarter of 2024, which was driven down by an increase in stock-based compensation expense of $90.9 million associated with restricted stock units, granted at the time of the Company's April 2024 initial public offering.
>
> • **Consolidated GAAP revenue for the first six months of 2024 was $1.9 billion, an increase of 31% over the first six months of the prior year, driven largely by increased facility count and reimbursement rates, and for the second quarter of 2024 was $981.8 million, an increase of 29% over the second quarter of 2023 and an increase of 5% over the first quarter of 2024.**
>
> • Adjusted EBITDA was $188.2 million and $99.7 million for the first six months of 2024 and the second quarter of 2024, respectively. Adjusted EBITDAR was $318.0 million and $165.6 million over the same periods, respectively.
>
> • Increase in guidance for full year 2024 Revenue and Adjusted EBITDA
> o Revenue expected to be in the range of $3.85 billion to $3.95 billion
> o Adjusted EBITDA expected to be in the range of $370 million to $380 million
>
> **Select KPIs:**
>
> • Total Facilities occupancy was 91.0% during the second quarter of 2024. Ramping and Mature Facilities occupancy increased by 1.4% and 1.0%, respectively, over the same quarter of the prior year.
>
> • **Average Medicare and Medicaid daily rates increased 9.5% and 3.5%, respectively, for the second quarter of 2024, as compared to the same quarter of the prior year.**

• In the second quarter of 2024 the Company added 2 operating facilities, including 167 skilled nursing beds, respectively.

\*\*\*

*"Our revenue growth was also driven in significant part by our adding 3,947 operational beds to the company over the twelve months ending June 30, 2024, leading to a 24.8% increase in patient days for the second quarter of 2024 compared to the same quarter of the prior year. Additionally, our occupancy remained strong across all facilities — 91.0% in the second quarter of 2024," said Derick Apt, PACS's Chief Financial Officer.*

\* \* \*

***Business Outlook***

***Based on information available as of today, PACS is providing the following guidance for full year 2024:***
 • ***Revenue expected to be in the range of $3.85 billion to $3.95 billion***
• ***Adjusted EBITDA expected to be in the range of $370 million to $380 million***

101.    Defendant Apt stated in the August 2024 Press Release:

Our revenue growth was also driven in significant part by our adding 3,947 operational beds to the company over the twelve months ending June 30, 2024, leading to a 24.8% increase in patient days for the second quarter of 2024 compared to the same quarter of the prior year. Additionally, our occupancy remained strong across all facilities — 91.0% in the second quarter of 2024.

102.    The statements in ¶¶99-101 above were materially false and misleading and failed to disclose, *inter alia*, that: (i) the Company's revenue growth was not driven by an increase in operational beds for patients but instead was driven by fraudulently charging patients for unnecessary and unused medical services; and (ii) the CMS Quality Measure rating was misleading because the CMS Quality Measure is only one aspect of the overall CMS rating, and most of the Company's facilities were in the 2 to 3 star overall CMS rating.

103.    On the same day, the Company filed its Form 10-Q for the second fiscal quarter of 2024 with the SEC (the "2Q 2024 Form 10-Q"), which was signed by Defendants Murray and Apt,

and attached SOX Certifications signed by Defendants Murray and Apt attested to the accuracy of the 2Q 2024 10-Q.

104.    The 2Q 2024 Form 10-Q continued to emphasize that "*[r]evenue is recognized when services are provided.*" In relevant part, the 2Q 2024 Form 10-Q stated:

> *Patient and resident service revenue - Patient and resident service revenue increased by $221.0 million to $981.4 million for the three months ended June 30, 2024,* a 29.1% increase compared to the three months ended June 30, 2023. For the three months ended June 30, 2024 and 2023, skilled nursing services revenue represented more than 99.0% of patient and resident service revenue.
>
> *Skilled nursing services revenue increased by 28.7%, or $217.1 million, to $973.1 million for the three months ended June 30, 2024,* compared to the three months ended June 30, 2023. This change was driven by an increase in operational beds of 3,947 from June 30, 2023 to June 30, 2024 leading to a 24.8% increase in patient days year-over-year.
>
> ***
>
> NOTE 3. REVENUE AND ACCOUNTS RECEIVABLE
>
> Patient and Resident Service Revenue
>
> The Company's *patient and resident service revenue is derived primarily from the Company's applicable subsidiaries providing healthcare services to their respective patients and residents. Revenue is recognized when services are provided to the patients* at the amount that reflects the consideration to which the Company expects to be entitled. These amounts are due from residents, third-party payors (including health insurers and government payors), and others and includes variable consideration for retroactive revenue adjustments due to settlement of audits and other reviews by the payor. Generally, the licensed healthcare provider entity providing the applicable services bills the applicable payors monthly.
>
> *The healthcare services in skilled patient contracts include routine services in exchange for a contractual agreed-upon amount or rate. Revenue is recognized as the performance obligations are satisfied.*
>
> *Performance obligations are determined based on the nature of the services provided by the applicable licensed healthcare provider entity. Revenue for performance obligations satisfied over time is recognized based on actual charges incurred in relation to total expected (or actual) charges.* The Company believes

- 44 -

that this method provides a faithful depiction of the transfer of services over the term of the performance obligation based on the inputs needed to satisfy the obligation.

* * *

**Medicaid:** Payments for skilled nursing facility services rendered to Medicaid (including Medi-Cal, which is the name of the state Medicaid program in California) program beneficiaries are based on an annually established daily reimbursement rate for eligible stays. The rate is adjusted annually. The final settlement is determined after submission of an annual cost report and audits thereof by Medicaid. ***Revenue from the Medicaid program amounted to 38.1% and 35.4% of the Company's condensed combined/consolidated net patient and resident revenue for the three months ended June 30, 2024 and 2023, respectively, and 38.4% and 32.9% of the Company's condensed combined/consolidated net patient and resident revenue for the six months ended June 30, 2024 and 2023, respectively.***

**Medicare**: Payments for skilled nursing facility services rendered to Medicare program beneficiaries are based on prospectively determined daily rates which vary according to a patient diagnostic classification system. The applicable licensed healthcare provider entity is paid for certain reimbursable services at the approved rate with final settlement determined after submission of the annual cost report and audit thereof by the designated Medicare fiscal intermediary. ***Revenue from the Medicare program amounted to 37.5% and 41.7% of the Company's condensed combined/consolidated net patient and resident revenue for the three months ended June 30, 2024 and 2023, respectively, and 36.6% and 44.8% of the Company's condensed combined/consolidated net patient and resident revenue for the six months ended June 30, 2024 and 2023, respectively.***

* * *

The following tables present the above key skilled services metrics by category for all facilities, Mature facilities, Ramping facilities and New facilities as of and for the six months ended June 30, 2024 and 2023:

| | Six Months Ended June 30, | | | |
| --- | --- | --- | --- | --- |
| | 2024 | 2023 | Change | % Change |
| | (dollars in thousands) | | | |
| Total facility results: | | | | |
| Skilled nursing services revenue | $ 1,900,538 | $ 1,461,568 | $ 438,970 | 30.0 % |
| Skilled mix by revenue | 51.6 % | 60.8 % | | (9.2)% |
| Skilled mix by nursing patient days | 29.5 % | 37.3 % | | (7.8)% |
| Occupancy for skilled nursing services: | | | | |
| Available patient days | 4,389,269 | 3,359,730 | 1,029,539 | 30.6 % |
| Actual patient days | 3,994,467 | 3,078,280 | 916,187 | 29.8 % |
| Occupancy rate (operational beds) | 91.0 % | 91.6 % | | (0.6)% |
| Number of facilities at period end | 214 | 185 | 29 | 15.7 % |
| Number of operational beds at period end | 24,483 | 20,536 | 3,947 | 19.2 % |

* * *

The following table presents average daily rates by payor source, excluding services that are not covered by the daily rate, for the three months ended June 30, 2024 and 2023:

| | Three Months Ended June 30, | | | | | | | |
| | Mature | | Ramping | | New | | Total | |
| Average daily rate | 2024 | 2023 | 2024 | 2023 | 2024 | 2023 | 2024 | 2023 |
|---|---|---|---|---|---|---|---|---|
| Medicare | $942.19 | $860.20 | $964.00 | $874.26 | $941.43 | $877.56 | $952.39 | $870.03 |
| Managed care | 607.42 | 578.47 | 669.00 | 622.60 | 576.64 | 660.87 | 625.09 | 615.61 |
| *Total for skilled patient payors* [1] | *799.34* | *755.50* | *840.05* | *773.19* | *744.55* | *808.09* | *805.42* | *776.92* |
| Medicaid | 295.91 | 289.89 | 307.71 | 297.55 | 308.84 | 296.27 | 304.70 | 294.46 |
| Private and other | 391.41 | 320.93 | 426.07 | 336.44 | 346.27 | 341.17 | 388.39 | 332.40 |
| *Total* [2] | *$465.52* | *$464.61* | *$494.08* | *$470.69* | *$405.66* | *$460.82* | *$458.53* | *$465.23* |

105. The 2Q 2024 Form 10-Q additionally contained the same false and misleading statements as discussed in ¶91-92.

106. The statements contained in ¶91-92 were materially false and misleading because, in reality, PACS was artificially inflating its revenues to COVID-era profitability by fraudulently billing for unnecessary treatments and services never provided to patients.

107. The statements in ¶¶103-104 above were also materially false and misleading and failed to disclose, *inter alia*, that: (i) PACS had been artificially inflating its revenues to COVID-era profitability levels by fraudulently billing patients for unnecessary and never used medical treatment; and (ii) PACS' revenue derived from Medicare patients in the first half of 2023 was improperly reported because the Company was misclassifying patients in order to get them to obtain Medicare benefits.

***August 12, 2024 Earnings Call***

108. The same day, the Company held an earnings call to discuss its financial results for the second quarter of fiscal year 2024 (the "2Q 2024 Earnings Call"). During the 2Q 2024 Earnings Call, Defendant Apt stated:

The occupancy has not seen a cyclical seasonal drop that we did most summers. The occupancies remain strong. The skilled mix is [sic] hung in there. And most importantly, our revenue per patient day continues to grow with capturing the acuity mix across the patient population. So really the EBITDA uptick is driven from that.

* * *

But as you see, our Medicare rate for the first half of the year, we were able to drive up, I believe, 9 percent, 9.5 percent. And really, that comes from capturing higher acuity . . . [W]e're getting rewarded financially for taking care of those clinical needs of the higher acuity patients.

109.    Also on the 2Q 2024 Earnings Call, Defendant Murray discussed the Company's revenue growth, stating "[t]he improvement of clinical outcomes is truly the most important factor in our financial strength" and that "[o]utlook for continued growth remains strong with a robust acquisition pipeline and continued improvements both clinically and financially in the operations we've recently acquired."

110.    The statements contained in ¶¶108-109 above were materially false and misleading and failed to disclose, *inter alia*, that the Company's revenue growth was actually driven by fraudulently billing patients for unnecessary and unused medical services.

### *August 19, 2024 Draft Registration Statement*

111.    On August 19, 2024, the Company filed a draft registration statement on a Form DRS with the SEC (the "August Draft Registration Statement"). The August Draft Registration Statement reported the Company's combined and consolidated financial results. The August Draft Registration Statement stated, in relevant part:

| | Year Ended December 31, | | | Six Months Ended June 30, | |
|---|---|---|---|---|---|
| | 2023 | 2022 | 2021 | 2024 | 2023 |
| | | | | (unaudited) | |
| | (in thousands, except share and per share data) | | | | |
| **Revenue** | | | | | |
| Patient and resident service revenue | $ 3,110,114 | $ 2,399,155 | $ 1,135,909 | $ 1,915,696 | $ 1,468,250 |
| Additional funding | $ 375 | $ 21,482 | $ 28,563 | $ — | $ 375 |
| Other revenues | $ 1,003 | $ 1,357 | $ 2,091 | $ 871 | $ 481 |
| Total Revenue | $ 3,111,492 | $ 2,421,994 | $ 1,166,563 | $ 1,916,567 | $ 1,469,106 |
| **Expenses** | | | | | |
| Cost of services | $ 2,447,713 | $ 1,861,314 | $ 901,095 | $ 1,498,139 | $ 1,129,587 |
| Rent-cost of services | $ 216,711 | $ 160,003 | $ 78,122 | $ 129,794 | $ 96,560 |
| General and administrative expense | $ 213,664 | $ 149,006 | $ 96,834 | $ 191,286 | $ 122,137 |
| Depreciation and amortization | $ 25,632 | $ 22,311 | $ 7,153 | $ 16,678 | $ 11,988 |
| Total Operating Expenses | $ 2,903,720 | $ 2,192,634 | $ 1,083,204 | $ 1,835,897 | $ 1,360,272 |
| Operating Income | $ 207,772 | $ 229,360 | $ 83,359 | $ 80,670 | $ 108,834 |
| **Other (expense) income** | | | | | |
| Interest expense | $ (49,919) | $ (25,538) | $ (5,278) | $ (24,578) | $ (25,942) |
| Gain on lease termination | $ — | $ — | $ — | $ 8,046 | $ — |
| Other (expense) income, net | $ (536) | $ 3,223 | $ 3,345 | $ (3,465) | $ (2,203) |
| Total Other Expense, net | $ (50,455) | $ (22,315) | $ (1,933) | $ (19,997) | $ (28,145) |
| Income before provision for income taxes | $ 157,317 | $ 207,045 | $ 81,426 | $ 60,673 | $ 80,689 |
| Provision for income taxes | $ (44,435) | $ (56,549) | $ (33,479) | $ (22,441) | $ (21,871) |
| Net income | $ 112,882 | $ 150,496 | $ 47,947 | $ 38,232 | $ 58,818 |
| **Less:** | | | | | |
| Net income attributable to noncontrolling interest | $ 8 | $ — | $ — | $ 4 | $ 3 |
| Net income attributable to PACS Group, Inc. | $ 112,874 | $ 150,496 | $ 47,947 | $ 38,228 | $ 58,815 |
| | | | | | |
| **Net income per share attributable to PACS Group, Inc.** | | | | | |
| Basic | $ 0.88 | $ 1.17 | $ 0.37 | $ 0.27 | $ 0.46 |
| Diluted | $ 0.88 | $ 1.17 | $ 0.37 | $ 0.27 | $ 0.46 |
| **Weighted-average common shares outstanding** | | | | | |
| Basic | 128,723,386 | 128,723,386 | 128,723,386 | 139,093,520 | 128,723,386 |
| Diluted | 128,723,386 | 128,723,386 | 128,723,386 | 139,684,618 | 128,723,386 |

\*\*\*

| | Year Ended December 31, | | | Six Months Ended June 30, | |
|---|---|---|---|---|---|
| | 2023 | 2022 | 2021 | 2024 | 2023 |
| | (Dollars in thousands) | | | | |
| **Key Skilled Services Metrics** | | | | | |
| Skilled nursing services revenue | $ 3,092,577 | $ 2,391,309 | $ 1,133,103 | $ 1,900,538 | $ 1,461,568 |
| Skilled mix by revenue | 55.1 % | 64.1 % | 57.8 % | 51.6 % | 60.8 % |
| Skilled mix by nursing patient days | 32.4 % | 40.7 % | 34.5 % | 29.5 % | 37.3 % |
| Occupancy for skilled nursing services: | | | | | |
| Available patient days | 7,457,345 | 5,719,689 | 3,106,602 | 4,389,269 | 3,359,730 |
| Actual patient days | 6,775,063 | 5,139,736 | 2,681,927 | 3,994,467 | 3,078,280 |
| Occupancy rate (operational beds) | 90.9 % | 89.9 % | 86.3 % | 91.0 % | 91.6 % |
| Number of facilities at period end | 203 | 150 | 138 | 214 | 185 |
| Number of operational beds at period end | 22,950 | 16,345 | 14,841 | 24,483 | 20,536 |
| **Non-GAAP Financial Measures** | | | | | |
| *Performance Measures* | | | | | |
| EBITDA[1] | $ 232,860 | $ 254,894 | $ 93,857 | $ 101,925 | $ 118,616 |
| Adjusted EBITDA[1] | $ 237,486 | $ 255,516 | $ 104,073 | $ 188,243 | $ 122,433 |
| *Valuation Measure* | | | | | |
| Adjusted EBITDAR[1] | $ 454,197 | | | $ 318,037 | |

112.    The August Draft Restatement additionally asserted the same false and misleading statements as discussed in ¶90.

113.    The statements contained in ¶¶111-112 above were materially false and misleading and failed to disclose, *inter alia*, that PACS was artificially inflating its revenues to COVID-era profitability by fraudulently billing for unnecessary treatments and services never provided to patients.

### *September 6, 2024 Form 424B4*

114.    On September 6, 2024, the Company filed a Form 424B4 for its SPO. The SPO Prospectus stated the following regarding the Company's compliance procedures:

> We operate in a highly regulated industry with stringent regulatory compliance obligations, which requires robust regulatory compliance operations. Failure to operate in compliance

with applicable laws and regulations could require significant expenditures and result in regulatory deficiencies and other regulatory penalties. PACS Services functions to support our regulatory compliance obligations across our organization, including through controlled billing and cost reporting practices and legal, risk management, and compliance support.

\* \* \*

***Robust culture of compliance***. We focus on instilling a unified, cohesive culture of innovation and compliance that we believe provides consistency in our results and confidence in our facilities as an attractive care option for patients. Our rigorous approach to billing integrity, our independent internal compliance function, and our regular facility billing audits are intended to provide a foundation of trust and collaboration that makes us a natural choice for payors.

\* \* \*

The SNF industry is highly regulated with stringent regulatory compliance obligations. In the ordinary course of business, providers are subject to federal, state and local laws and regulations relating to, among other things, billing and reimbursement, relationships with vendors, business relationships with physicians and other healthcare providers and facilities, as well as licensure, accreditation, enrollment, quality, adequacy of care, physical plant, life safety, personnel, staffing and operating requirements. Changes in or new interpretations of existing laws and regulations may have a significant impact on revenue, costs and business operations of providers and other industry participants. In addition, governmental and other authorities periodically inspect the SNFs, senior living facilities and outpatient rehabilitation agencies to verify continued compliance with applicable regulations and standards, and may impose citations and other regulatory penalties for regulatory deficiencies. Such regulatory penalties include but are not limited to civil monetary penalties, temporary payment bans, suspension or revocation of a state operating license and loss of certification as a provider in the Medicare or Medicaid program, any of which may be temporary or permanent in nature. This regulatory environment and related enforcement can have an adverse effect on providers and other industry participants.

\* \* \*

We operate in a highly regulated industry with stringent regulatory compliance obligations, and are subject to extensive and complex laws and government regulations. If we are not operating in compliance with these laws and regulations or if these laws and regulations change, we could be required to make significant expenditures or change our operations in order to bring our facilities and operations into compliance.

\* \* \*

We have internal compliance professionals and invest in other resources to help us comply with various requirements of federal and private healthcare programs. Our compliance program includes, among other things, (1) policies and procedures that take into account applicable laws, regulations, sub-regulatory guidance and industry practices and customs

that govern the clinical, reimbursement and operational aspects of our operating subsidiaries; (2) training about our compliance process for employees throughout our organization, our directors and officers, and training about Medicare and Medicaid laws, fraud and abuse prevention, clinical standards and practices, and claim submission and reimbursement policies and procedures for appropriate employees; and (3) internal controls that monitor, among other things, the accuracy of claims, reimbursement submissions, cost reports and source documents, provision of patient care, services, and supplies as required by applicable standards and laws, accuracy of clinical assessment and treatment documentation, and implementation of judicial and regulatory requirements (i.e., background checks, licensing and training).

\* \* \*

While we have not experienced any material compliance issues to date, from time to time, our systems and internal controls highlight potential compliance issues, which we investigate as they arise. We similarly investigate concerns that are reported to us by employees or other persons. When errors or compliance failures are identified, we seek to rectify them as appropriate. Depending on the circumstances, in order to rectify a failure, we may be required to take certain actions, including but not limited to self-reporting them to applicable federal and state regulators, government agencies or other third parties, disgorging or paying money to the government or other third parties, and implementing changes to systems, personnel or other resources in order to mitigate the risk of recurrence, all of which could result in significant costs. Such issues, and any failure to properly remediate such issues or to timely identify and refund overpayments, for instance, could result in potential federal False Claims Act (FCA) liability and could have a material adverse effect on our business, financial condition and results of operations. Other significant compliance failures could have similar negative impacts.

115.    The SPO Prospectus also stated, in relevant part:

We have built a multi-faceted growth strategy with multiple organic and inorganic levers to help drive our growth and capitalize on the favorable industry dynamics.

\* \* \*

Our portfolio has a healthy foundation for strong embedded organic growth.

\* \* \*

For the six months ended June 30, 2024 and 2023, we generated total revenue of $1.9 billion and $1.5 billion, respectively. A substantial portion of our revenue is generated from payments from third-party payors, including Medicare and Medicaid, which represent our largest sources of revenue and accounted for 36.6% and 38.4% of our total revenue for the six months ended June 30, 2024, respectively, and 44.8% and 32.9% of our total revenue for the six months ended June 30, 2023, respectively. For the six months ended June 30, 2024, we generated total net income of $38.2 million, total operating expense of $1.8 billion and

Adjusted EBITDA of $188.2 million. For the six months ended June 30, 2023, we generated total net income of $58.8 million, total operating expense of $1.4 billion and Adjusted EBITDA of $122.4 million. For the year ended December 31, 2023, we generated total revenue of $3.1 billion, and Medicare and Medicaid accounted for 38.6% and 37.6% of our total revenue, respectively. For the year ended December 31, 2022, we generated total revenue of $2.4 billion, and Medicare and Medicaid accounted for 47.6% and 30.2% of our total revenue, respectively. For the year ended December 31, 2023, we generated total net income of $112.9 million, total operating expense of $2.9 billion and Adjusted EBITDA of $237.5 million. For the year ended December 31, 2022, our total operating expenses were $2.2 billion, and we generated net income of $150.5 million and Adjusted EBITDA of $255.5 million.

116.    The statements contained in ¶¶114-115 above were materially false and misleading because (i) Company's revenue growth was actually driven by fraudulently billing patients for unnecessary and unused medical service; (ii) PACS' risk disclosures mischaracterized adverse facts that the Company was actually facing as mere possibilities; (iii) PACS was misclassifying employees in violation of its licensure requirements; and (iv) PACS risk disclosures mischaracterized adverse facts that the Company was actually facing as mere possibilities.

**The Truth Emerges**

117.    The truth began to emerge on November 5, 2024, when Hindenburg released its report revealing the Company's manipulation and misuse of the COVID Waiver program and fraudulent billing practices. The Hindenburg Report claimed that the Company would misclassify lower-acuity patients as high-acuity patients in order to secure higher reimbursement rates from Medicare. The Hindenburg Report further claimed that once the COVID Waiver program expired, PACS began to bill patients for unnecessary and never performed treatments in order to maintain its profitability from the COVID Waiver program. Also, the Hindenburg Report alleged that, in order to meet states' minimum staffing requirements and bonus programs, PACS began to misrepresent its staffing levels and qualifications.

118.    The Hindenburg Report further detailed these allegations, stating, in relevant part:

Evidence shows the most aggressive of these practices was a management-driven, company-wide scheme to defraud Medicare through the COVID emergency, evidenced by anomalies in PACS' Medicare revenue, and corroborated by more than a dozen former PACS employees, ranging from frontline clinical staff to regional managers.

We believe this scheme funded PACS' aggressive acquisition strategy throughout COVID and drove substantially all of its earnings from early 2020 to the end of 2023, giving investors the illusion of legitimate growth and profitability leading into its IPO. . . .

***

During our research, we conducted in-depth interviews with 18 former PACS employees who had worked in clinical, compliance, and human resources departments. Former employees detailed how PACS engaged in a multi-year, nationwide scheme to use the COVID waiver to "flip" patients from Medicaid to Medicare based on COVID exposure, roughly tripling per-patient revenue, even though the great majority of these patients didn't need Medicare-covered skilled nursing care…

**"…As Soon As One Person Tested [Covid-19] Positive In Our Building, Boom, Wildfire, Every Single Person Gets Flipped [To Medicare], Absolutely Inappropriately…" – Former PACS Regional Manager**. . . .

However, after the COVID waiver expired, PACS' quarterly Medicare revenue declined suddenly and without explanation from a reported peak of ~$340 million in Q1 2023 to an estimated $271 million in Q4 2023— a decline that investors would miss if they only looked at full year revenue.

When accounting for and removing the impact of newly acquired facilities, the fall-off in Medicare revenue was an estimated ~$90 million per quarter, equivalent to ~$360 million in annualized revenue. . . .

***

**Part 2: PACS' "New Trick" To Maintain Growth Post-COVID Is Abusing Yet Another Medicare Program**

***

A former PACS administrator from California explained that the scheme involves billing respiratory and sensory integration therapies to Medicare Part B, even when these therapies aren't applicable to patients. . . .

According to the former administrator, the widespread implementation of respiratory therapy programs, among other Part B programs, was a way to "cover up" a loss of net operating income from the COVID waiver…

***

- 53 -

**Former PACS Employees Say The Company Allowed Unlicensed Individuals To Run Entire Facilities, While PACS "Rents" A License From Someone Else To "Hang" On The Building In An Apparent Effort To Fool Regulators**

In California, SNF administrators must be licensed and are not allowed to manage more than 200 beds, which can be spread across a maximum of 3 facilities.

A former administrator described how PACS places unlicensed individuals in administrator positions, while paying retired administrators ~$3,000 a month to "hang" their licenses on the facilities, despite them not working at that facility, or for PACS in any capacity:

*"... a lot of the times they were putting guys in the buildings that weren't even licensed. So they were running buildings without being licensed, and they would just hang a license until that guy did have one... I mean, **I had a buddy that wasn't even working in the industry, and PACS paid him to hang a license on a building. I think they paid him like $3,000 a month to hang his license...** I think the Regional [Vice President] Venmo'd him."*

A second former administrator corroborated this practice, saying that PACS will simply use someone else's license for a facility, despite that person not actively working at the facility . . .

***

**Former Employees Claim That PACS Retroactively Adds In Fake RN Hours In Another Apparent Effort To Meet Minimum Staffing Requirements And Boost Star Ratings**

**Former Employee: "Not Only Were They Billing For Hours That Weren't Actually Worked, They Also Were Advertising That They Were A Higher Star Rated Building … When They Technically Weren't, Because They Manipulated Their Staffing To Be A Higher Star"**

119.    On this news, the price per share of PACS stock fell $11.93, or approximately 27.78%, from a closing price of $42.94 per share on November 1, 2024 to close at $31.01 per share on November 4, 2024, on unusually heavy trading volume.

120.    The truth fully emerged before the market opened on November 6, 2024, when the Company announced it would postpone its earnings release for the fiscal third quarter of 2024. The Company disclosed it had "***received civil investigative demands from the federal government regarding the Company's reimbursement and referral practices that may or may not be related to this week's third-party report.***"

121.    On this news, the price per share of PACS stock fell $11.45, or approximately

38.76%, from a closing price of $29.54 per share on November 5, 2024 to close at $18.09 per share on November 6, 2024, after unusually heavy trading volume.

**DAMAGES TO PACS**

122.    As a direct and proximate result of the Individual Defendants' conduct, PACS has lost and expended, and will continue to lose and expend, many millions of dollars.

123.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

124.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgements associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

125.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations, including costs associated with the civil investigative demands PACS received from the federal government regarding the Company's reimbursement and referral practices.

126.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

127.    As a direct and proximate result of the Individual Defendants' conduct, PACS has

also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock price in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

128.    Plaintiff brings this action derivatively and for the benefit of PACS to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholders, directors, and/or officers of PACS, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

129.    PACS is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

130.    Plaintiff is, and has been at all relevant times, a shareholder of PACS. Plaintiff will adequately and fairly represent the interests of PACS in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY

131.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

132.    A pre-suit demand on the Board is futile and, therefore, excused. At the time of the commencement of this action, the Board consisted of the following five individuals: Defendants Murray, Dilsaver, Hancock, Leavitt, and Millard (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to three of the five Director-Defendants.

133.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

134.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted PACS to issue materially false and misleading statements. Specifically, the Director-Defendants caused PACS to issue false and misleading statements which were intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

135.    Additional reasons that demand on Defendant Murray is futile follow. Defendant Murray founded PACS in 2013 and has served as the Company's CEO and as Chairman of the Board since its inception. As such, the Company provides Defendant Murray with his principal occupation for which he receives lucrative compensation. Thus, as the Company admits, Defendant Murray is a non-independent director. As PACS' CEO and as one of its trusted directors, Defendant Murray was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of himself and the Company during the Relevant Period. As a trusted Company director, Defendant Murray conducted little, if any,

oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Murray signed the 1Q 2024 10-Q and the 2Q 2024 10-Q. Further, Defendant Murray's insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme. For these reasons, Defendant Murray breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

136.    Additional reasons that demand on Defendant Dilsaver is futile follow. Defendant Dilsaver has served as a Company director since May 9, 2024. She also serves as the Chair of the Nominating and Corporate Governance Committee, a member of the Compensation Committee, and as a member of the Audit Committee. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Dilsaver breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

137.    Additional reasons that demand on Defendant Hancock is futile follow. Defendant Hancock founded the Company since 2013 and has also served as Executive Vice Chairman of the Board since January 1, 2024. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements,

consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, Defendant Hancock's insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme. For these reasons, Defendant Heyer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

138.    Additional reasons that demand on Defendant Leavitt is futile follow. Defendant Leavitt has served as a Company director since July 2023. He also serves as Chair of the Compensation Committee and as a member of the Audit Committee and the Nominating and Governance Committee. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Leavitt breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

139.    Additional reasons that demand on Defendant Millard is futile follow. Defendant Millard has served as a Company director since 2022. She also serves as Chair of the Audit Committee and member of the Nominating and Governance Committee and Compensation Committee. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously

disregarded her duties to protect corporate assets. For these reasons, Defendant Millard breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

140.    Additional reasons that demand on the Board is futile follow.

141.    Defendants Millard, Dilsaver, and Leavitt (collectively the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

142.    In violation of the Code of Ethics, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Ethics by failing to act with integrity, failing to avoid conflicts of

interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Ethics and the law. Thus, the Director-Defendants breached the Company's own Code of Ethics, are not disinterested, and demand is excused as to them.

143.    PACS has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or any others who were responsible for that wrongful conduct to attempt to recover for PACS any part of the damages PACS suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

144.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

145.    The acts complained of herein constitute violations of fiduciary duties owed by PACS' controlling shareholders, officers, and directors, and these acts are incapable of ratification.

146.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate

funds, i.e., monies belonging to the stockholders of PACS. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of PACS, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

147.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause PACS to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

148.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

149.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

150.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of PACS' business and affairs.

151.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

152.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of PACS.

153.    Moreover, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about PACS' business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that, with regard to the Company's financial statements, Defendants knew and/or recklessly disregarded that (i) PACS' misused the COVID Waiver program to artificially inflate their revenues (ii) Company's revenue growth was actually driven by fraudulently billing patients for unnecessary and unused medical service; (iii) PACS risk disclosures mischaracterized adverse facts that the Company was actually facing as mere possibilities; (iv) PACS was misclassifying employees in violation of its licensure requirements; and (v) PACS risk disclosures mischaracterized adverse facts that the Company was actually facing as mere possibilities.

154.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

155.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

156.    In yet further breach of their fiduciary duties, during the Relevant Period, two of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $656.8 million.

157.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of PACS' securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

158.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

159.    As a direct and proximate result of the Individual's Defendants' breaches of their fiduciary obligations, PACS has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

160.    Plaintiff, on behalf of PACS, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Unjust Enrichment

161.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

162.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, PACS.

163.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from PACS that was tied to the performance or artificially inflated valuation of PACS, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments, including payments under the Plan, provided to the Individual Defendants who breached their fiduciary duties to the Company.

164.    Plaintiff, as a shareholder and representative of PACS, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

165.    Plaintiff, on behalf of PACS, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Abuse of Control

166.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

167.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence PACS, for which they are legally responsible.

168.     As a direct and proximate result of the Individual Defendants' abuse of control, PACS has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, PACS has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

169.     Plaintiff, on behalf of PACS, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

170.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

171.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of PACS in a manner consistent with the operations of a publicly held corporation.

172.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, PACS has sustained and will continue to sustain significant damages.

173.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

174.     Plaintiff, on behalf of PACS, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

175.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

176.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused PACS to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to incur losses as a result of the Restatement, and to lose assets from investors and customers who no longer trust the Company.

177.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

178.    Plaintiff, on behalf of PACS, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Defendants Murray, Apt, Dilsaver, Leavitt, and Dilsaver for Contribution Under Sections 11(f) of the Securities Act and 21D of the Exchange Act

179.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

180.    As a result of the conduct and events alleged above, the Company is a defendant in the Securities Class Action brought on behalf of PACS shareholders, in which it is a joint tortfeasor in claims brought under Sections 11, 12, and 15 of the Securities Act

181.    Federal law provides PACS with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

182.    The plaintiffs in the Securities Class Action allege that the Registration Statement

issued in connection with the Company's offering contained untrue statements of material facts or omitted to state other facts necessary to make the statement made not misleading and omitted to state material facts required to be stated therein.

183.    The plaintiffs in the Securities Class Action allege that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and other subsequent public filings were true and without omissions of any material facts and were not misleading.

184.    Defendants Murray, Apt, Dilsaver, Leavitt, and Dilsaver, because of their positions of control and authority as controlling shareholders, officers, and/or directors of PACS, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of PACS, including the wrongful acts complained of herein and in the Securities Class Action.

185.    Accordingly, the Defendants Murray, Apt, Dilsaver, Leavitt, and Dilsaver are liable under Section 11(f) of the Securities Act, 14 U.S.C. §77k(f)(1), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. §78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

186.    As such, PACS is entitled to receive all appropriate contribution or indemnification from Defendants Murray, Apt, Dilsaver, Leavitt, and Dilsaver.

## **REQUEST FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of PACS, and

that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to PACS;

(c)    Determining and awarding to PACS the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing PACS and the Individual Defendants to take all necessary actions to reform and improve PACS' corporate governance and internal procedures to comply with applicable laws and to protect PACS and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of PACS to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding PACS restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including

reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: August 19, 2025

**ANDERSON & KARRENBERG**

*/s/ Jared D. Scott*
Jared Scott
Broadway Media Building
50 West Broadway, Suite 700
Salt Lake City, UT 84101
Email: jscott@aklawfirm.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## <u>VERIFICATION</u>

I, Emily Jean Boers, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 14th day of August, 2025.

DocuSigned by:

Emily Jean Boers